[No. 33299. Department One. January 12, 1956.]

RICHARD CABE et al., *Respondents*, v. H. A. HALVERSON et al., *Appellants*.[1]

O. M. Nelson, for appellants.

John B. Adams, for respondents.

DONWORTH, J.—This is an action brought to establish a boundary line and to recover treble damages from an alleged trespasser for cutting and destroying standing timber.

[1] Reported in 292 P. (2d) 220.

The material facts in this case are not in dispute. Government lots 8 and 9 (each less than 40 acres) in section 24, township 17 north, range 6 west, W. M., Grays Harbor county, correspond in location to a southeast quarter of a northeast quarter and a northeast quarter of a southeast quarter, respectively. The line between these two lots thus corresponds generally to an east-west center line of a sec-. tion.

In 1922, defendant husband (hereinafter referred to as though he were the sole defendant) purchased lot 9. At that time the locality was generally an unimproved wooded area. Defendant observed a fence marking the east-west center line of the adjacent section in the township adjoining his land on the east and assumed that an extension west from this fence would be the true boundary line between lots 8 and 9. In 1928, he built a fence along this line as extended across lot 9 after he had cleared the land south of this line.

In 1943, Jarvis bought lot 8 ("Oh, I believe I bought that in 1943. I am not positive of that.") from an undisclosed vendor. Defendant, at that time, pointed out to Jarvis the fence he had erected and stated that this fence was on the boundary between the two lots. Thereafter, defendant and Jarvis considered such fence as being the true boundary between their lots until sometime during 1950 or 1951, when defendant hired a surveyor to locate the true boundaries of his property.

This surveyor placed the north boundary of lot 9 as being about 105 feet north of the fence. The area north of the fence was still an unimproved wooded area. Promptly upon learning the results of the survey, defendant notified Jarvis that he was claiming title to the property north of the fence up to the boundary indicated by the survey. Jarvis had no intention of claiming any land other than what was encompassed within the true boundaries of his lot, and advised defendant that, because he was not financially able to hire a surveyor, he would not contest the results of the survey.

Thereafter, defendant attempted to sell lot 9 to plaintiff husband (hereinafter referred to as though he were the sole plaintiff), and pointed out to plaintiff that the north boundary of lot 9 was about 105 feet north of the fence. Later, and sometime shortly before August 3, 1952, plaintiff purchased lot 8 from Jarvis.. During February and March, .1953, defendant, having sold the merchantable timber standing in the area 105 feet north of his fence, caused the same to be logged off.

Shortly thereafter, plaintiff hired a surveyor to determine the true line between lots 8 and 9. This surveyor placed the line as being about thirty feet north of the fence. Upon the basis of this survey, plaintiff commenced this action on February 11, 1954, alleging that he owned lot 8, that defendant had trespassed upon lot 8 and cut down and removed twenty-three trees and destroyed numerous small alder and second growth fir trees. The prayer sought recovery of treble damages.

Defendant answered, denying the allegations of the complaint, and cross-complained to establish the north boundary of lot 9 as being 105 feet north of the fence and to quiet defendant's title in the property up to that boundary line. The reply denied the allegations of the cross-complaint.

When the case came on for trial before the court sitting without a jury, both parties called professional surveyors as witnesses. The parties were in agreement that there was an *offset* between the north boundary of lot 9 and the center line of the section adjacent thereto on the east. The amount of this *offset* was the principal matter in dispute.

These witnesses agreed that the true northeast corner of section 24 had been found. Plaintiff's surveyors, measuring south from this corner, and relying upon the notes of a private surveyor, Mr. Alexander (then deceased), who had surveyed the area in about 1911, reset the *obliterated quarter corner* and (ignoring a slight discrepancy) determined that the offset was thirty feet north of the fence. Defendant's surveyor, Robert Powell, relying upon the notes of the government survey of 1882, surveyed the entire township

line from the northeast corner of section 24 for a distance of about one and one-half miles south to the east-west center line of section 25. He determined that the offset was 102.96 feet north of the fence.

Testifying with reference to a map in evidence which he had prepared, Powell compared the government's, Alexander's, and plaintiff's surveyor's surveys with his own survey. He showed how his survey agreed and coincided with the government's and pointed out the discrepancy between the government's survey and that made by Alexander and by plaintiff's surveyors. He testified at great length in explaining how Alexander made an error, and the effect which that error had upon the lines and monuments set by Alexander.

Both of plaintiff's surveyors, without checking against the government survey notes, had accepted Alexander's notes as being correct and had relied solely upon these notes in their survey. Thus, the vice in their surveys was that they failed to detect Alexander's error. During rebuttal, respondent's surveyor, Rowe, admitted, on direct examination, that Powell had followed the correct method in making his survey and the only criticism he offered was that Powell was discrediting Alexander.

At the conclusion of the trial, the court took the matter under advisement and the parties submitted briefs. Thereafter, upon order of the court, oral argument was had. Three weeks later, the court rendered a written memorandum of decision. Thereafter, defendant's motion for a new trial was argued and denied. On February 18, 1955, the court made findings of fact, conclusions of law, and entered judgment.

The judgment decreed (a) that the fence constructed by defendant in 1928 was "the true and lawful boundary line" between lots 8 and 9, (b) that plaintiff's title be quieted in "all land situated in said Government Lot 8 lying north of the said fence line in said Lot 8," and (c) that plaintiff recover damages in the amount of $178.40, together with

costs and disbursements. From this judgment, defendant appeals.

For a proper disposition of this case we need only discuss two errors assigned: (a) to the making of findings 3, 4, and 5, and (b) to the entry of judgment.

Finding of fact No. 3 is supported by undisputed evidence. It merely recites that appellant erected the fence in 1928, and for twenty-three years thereafter considered it as marking the true north boundary of lot 9.

Finding of fact No. 4 reads as follows:

"That when plaintiffs purchased the said Lot 8 they were advised that the said fence constituted the boundary line between said Lots 8 and 9, and *plaintiffs have at all times since recognized and accepted said fence to be such boundary line*; and, that the person who owned said Lot 8 prior to plaintiffs, one Jarvis, believed said fence to be such boundary line and was so advised by defendant H. A. Halverson, and said Jarvis recognized and accepted said fence as such boundary line; and, that *the parties hereto and the predecessors in ownership of the plaintiff in said Lot 8 did, for more than 20 years after said fence was constructed, consider and believe said fence to be such boundary line and acquiesced therein and recognized and accepted the same.*" (Italics ours.)

The first italicized clause of finding of fact No. 4 is contrary to the evidence, the second is without support in the evidence, and the remainder thereof, while it finds some support in the evidence, is not an accurate statement.

While at the time respondent purchased lot 8 Jarvis might have advised him that the fence was the boundary between the two lots, there is uncontradicted evidence that prior to this sale appellant had informed both Jarvis and respondent that the true boundary was 105 feet north of the fence. If, however, respondent did at that time rely upon the representation of Jarvis as to the boundary, his reliance was short-lived, because his surveyor informed him eight months later that he had located the true line as being thirty feet north of the fence. On cross-examination, respondent testified:

"Q. So then this fence wasn't the true line? . . . A. I didn't say it was. Q. No. And the way your engineer has measured it out it is 30 feet north of where the line fence is now? A. That is correct."

Even though appellant did at one time advise Jarvis that the fence was on the boundary line, he also, in 1950 or 1951, showed Jarvis a survey map and advised him that the fence was not the boundary line. Jarvis at that time ceased to recognize the fence as the boundary line. He testified that there was no dispute over the line. He merely accepted appellant's representations as to the boundary line as being true in both instances.

Jarvis is the only witness who is a predecessor in interest of respondent in the ownership of lot 8. Jarvis considered the fence as the boundary line only for a period of seven or eight years. Respondent considered the fence as the boundary line only for seven or eight months. There is no evidence in the record upon which to base the finding that respondent and his predecessors had "for more than 20 years after said fence was constructed" considered the fence as the boundary line.

Finding of fact No. 5 reads as follows:

"That between February 1, 1953 and April 1, 1953 the defendants unlawfully entered upon and trespassed upon land of the plaintiffs, *the same being that portion of said Lot 8 immediately north of the said fence,* and then and there injured, cut down, removed and carried away certain trees and timber of the plaintiffs, and converted and disposed of the same to their own use; . . . without any authority so to do." (Italics ours.)

The trees removed and destroyed by appellant were all standing within the area between the fence and that point 105 feet north thereof, which appellant claims is the true boundary line. The court did not make any specific finding with regard to which of the lines established by the surveys was the true south boundary between lots 8 and 9. Neither party contended that the fence was the true boundary between the lots. The court did not completely disregard the testimony relating to the surveys, however, for in its memo-

randum decision, citing *Niven v. Sheehan*, 46 Wn. (2d) 152, 278 P. (2d) 784, it said that *respondent acquired title to the fence line by adverse possession.* This holding indicates that the court did not consider the fence as being the true south boundary *of lot 8* but rather as being the south boundary of *respondent's property.*

In order to arrive at this holding, the court had to believe the testimony of one of the surveyors, but we have no way of determining which surveyor the court believed. Respondent's evidence located the boundary as being thirty feet north of the fence, and appellant's located the boundary as being 102.96 feet north of the fence.

■ If the court had made a finding that the true boundary line was thirty feet north of the fence, we would be compelled to hold that the evidence preponderates against such a finding. If, however, the court had made a finding that the true boundary was 102.96 feet north of the fence, we would be compelled to adopt such a finding as being supported by the overwhelming preponderance or weight of the evidence. Therefore, we must hold that the true east-west boundary line between lots 8 and 9 is located 102.96 feet north of the fence.

Since the evidence does not indicate that this case involves an instance of a compromise and settlement of a disputed boundary, we shall next consider the issue of adverse possession.

■ "Possession, to be adverse, must be actual and uninterrupted, open and notorious, hostile, and exclusive, and under a claim made in good faith." *Taylor v. Talmadge*, 45 Wn. (2d) 144, 273 P. (2d) 506.

Many cases are cited by counsel in their argument of the issue of adverse possession, but *Niven v. Sheehan, supra,* cited by the court in its memorandum decision, is perhaps the best illustration of the rule contended for and its application. In that case, it is said:

"In the case at bar, both parties and their predecessors in interest recognized the rockery and the bulkhead as the true boundary. Appellants held up to the barrier under a

claim of right. They held the disputed strip as owners, and not subservient to the rights of respondent. When property is held continuously during the statutory period of ten years up to a barrier recognized and accepted as the boundary line between it and adjoining property, under a claim of right as owner, although the true line is on the property of the person or persons so holding, that portion between the true line and the recognized barrier is held adversely to the true owner [citing cases]."

What is the longest continuous period of time wherein an owner of lot 8 recognized and accepted the fence as being the true south boundary of that lot? Jarvis thought it was in 1943 (when he purchased lot 8) that he was told the fence was the boundary, and that in 1950 or 1951 (after appellant's first survey), he was told it was not the boundary. This is at most only a period of eight years and falls short of the ten-year period of the statute of limitations.

There is absolutely no evidence in the record that would establish that those in possession of lot 8 subsequent to the time of appellant's first survey ever held adversely to the true owner of the disputed tract.

It follows, therefore, that the trial court erred in holding that respondent acquired title to the disputed tract by adverse possession. Since the location of the true boundary between lots 8 and 9 must be placed 102.96 feet north of the fence, it also follows that appellant, in his logging operations, did not trespass upon respondent's land.

The judgment must be, and hereby is, reversed and the cause is remanded to the superior court with directions to dismiss the complaint and to enter judgment for appellant on the cross-complaint quieting appellant's title in lot 9 up to the east-west center line of section 24 as established by Powell's survey.

It is so ordered.

HAMLEY, C. J., SCHWELLENBACH, FINLEY, and OTT, JJ., concur.